UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 21-cr-00374-APM-1 |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| LOGAN GROVER, | ) |  |
|  | ) |  |

**MOTION TO TRANSFER VENUE FOR TRIAL**

Logan Grover, by and through counsel Megan M. Downing of Recht Kornfeld P.C., and pursuant to Federal Rule of Criminal Procedure 21(a), respectfully moves the Court to issue an Order transferring the proceedings in this matter to another district for trial. Specifically, he moves for a transfer to his home District of Colorado. As grounds, he states:

**BACKGROUND**

The United States has charged Mr. Grover by Complaint in this matter with four offenses related to the breach of the United States Capitol on January 6, 2021. (*See* ECF, Document 1). The defense incorporates by reference the alleged facts of this case as articulated in its Motion to Dismiss Based Upon Defective Complaint and Unconstitutional Vagueness and Overbreadth and in the Alternative Motion for Bill of Particulars and does not restate them here in their entirety. (*See generally, Motion to Dismiss Based Upon Defective Complaint and Unconstitutional Vagueness and Overbreadth and in the Alternative Motion for Bill of Particulars*). The Government alleges generally that Mr. Grover travelled to Washington D.C. to participate in the protests at the United States Capitol and that he entered the Capitol building on January 6, 2021. (*See* ECF, Document 1.) The Court has scheduled a jury trial in this matter to commence with jury selection June 10, 2022.

1

These cases are unprecedented both in the number of defendants charged in connection with the events at the U.S. Capitol January 6, 2021 and the widespread and ongoing publicity they have received. The question is whether the impact on the community and the negative pretrial publicity resulting from the many events of January 6, 2021 render it impossible for Mr. Grover to receive a fair trial in the District of Columbia.

As best evidence of the characteristics of the jury pool in Washington D.C. and to support the arguments raised by this motion, counsel attaches a survey commissioned by the Federal Public Defender's Office for the District of Columbia. (*See*, Ex. 1.) The Federal Public Defender authorizes the use of this study by the defense bar as support for motions to transfer venue in these cases.  The data demonstrates that the current jury pool harbors demonstrable and unique prejudice toward the people charged in connection with the January 6, 2021 protests. (*See*, Id.)

## ARGUMENT

The U.S. Constitution guarantees the right to trial by an impartial jury. Const. Amends. V, VI. While venue is proper in the state or district where the crimes are alleged to have been committed, the Constitution's place-of-trial prescriptions do not impede transfer of the proceedings to a different district at the defense's request if extraordinary local prejudice will prevent a fair trial—a "basic requirement of due process". (*See*, *Skilling v. United States*, 561 U.S 358, 378 (*citing In re Murchison*, 349 U.S. 133, (1955)). As the Supreme Court noted in *Skilling*, "[t]he theory of our trial system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Id* at 378. Indeed, the Court must transfer proceedings upon a defendant's motion if the defendant cannot obtain a fair and impartial trial due to prejudice. Fed. R. Crim. P. 21(a).

2

Rule 21 of the Federal Rules of Criminal Procedure provides:

> (a) **For prejudice**. Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

In assessing whether a presumption of prejudice exists, the Supreme Court in *Skilling* looked to the foundation precedent established by *Rideau v. Louisiana,* 373 U.S. 723 (1963), articulating various factors for the Court to consider, including 1) the size and characteristics of the community in which the crime occurred, 2) information reported by the media related to the guilt of the defendant, and 3) the duration of time between a widely reported crime and the trial. *Skilling*, 561 U.S. at 382. The Defense contends that each of these factors gives rise to concerns in this case which provide grounds for a transfer of venue.

## I.     The size and characteristics of the District of Columbia support a change of venue because Mr. Grover will face a jury prejudiced against him.

The *Skilling* Court noted that in *Rideau* the crime at issue, murder, was committed in a parish in Louisiana of only 150,000 residents. (*Id*.) The Court compared this dynamic to the *Skilling* case and the then more than 4.5 million individuals eligible for jury duty who resided in the Houston area, noting specifically that Houston is the fourth most populous city in the Nation. (*Id*.) The Court characterized Houston as a "large, diverse pool of potential jurors" and found that Houston's size and diversity, unlike in small-town Louisiana, diluted the media's impact. (*See Id*.)

In this case, while Washington, D.C. is metropolitan like Houston, it is not among the largest cities in the nation. According to the U.S. Census Bureau, the population of Washington D.C. falls below 700,000.[1] Over 700 defendants have been charged in connection with the January

---

[1] See United States Census Bureau "Quickfacts" at census.gov/quickfacts/DC.

6, 2021 events at the Capitol.[2] As a further distinguishing factor from *Skilling,* the impact on the community as the result of the hundreds of cases charged—the number of victims and potential victims—is far greater than that of a single offense perpetrated against a single individual.

**A. A jury study demonstrates decidedly hostile attitudes held by prospective D.C. jurors against people like Mr. Grover.**

According to the attached jury pool analysis conducted by Select Litigation L.L.C. and commissioned by the Federal Public Defender's Office:

> Prospective jurors in the District of Columbia have decidedly negative impressions of individuals arrested in conjunction with the activities of January 6, 2021. Their bias against the defendants is evident in numerous results and is reflected in a significant prejudgment of the case*: a clear majority admit they would be inclined to vote "guilty" if they were serving on a jury at the defendants' trial*. The attitudes of prospective jurors in the District of Columbia are decidedly more hostile toward the defendants than adults nationwide or prospective jurors in a demographically comparable federal court division. (*See Ex. 1 at 2.)* (emphasis added).

The study indicates that the vast majority (84%) have an unfavorable opinion of the "people arrested for participating in the events at the Capitol on January 6." (*Id*, at 3, ¶ 9.)

An overwhelming majority of the District of Columbia jury pool have a prejudgment about the case: 71% of jurors polled indicate that they believe the people who were arrested for activities related to those demonstrations are "guilty." (*See, Id* at 3 ¶ 10.)

According to the attached jury study:

> "these opinions of the defendants among prospective District of Columbia jurors are buttressed by strong underlying beliefs about the defendants' associations,

---

[2] See The United States Department of Justice Capitol Breach Investigation Resource Page at justice.gov/usao-dc/capitol-breach-cases.

beliefs, actions, and motivations. First, large majorities accept, and few prospective jurors reject, negative descriptions of the defendants. Seven of every ten (70%) would describe the defendants as "conspiracy theorists," 62% would describe them as "criminals," 58% would describe them as "white supremacists," and 54% would describe them as "members of a violent right-wing organization." No more than 30% say they would not use any one of these terms to describe the defendants. (*Id* at 3, ¶ 14.)

The prospective D.C. jurors for Mr. Grover have preconceived notions about the intent of the accused. These potential jurors believe that people like Mr. Grover were "trying to overturn the election and keep Donald Trump in power." (*Id,* at Page 4, ¶ 15.) Approximately, three quarters (76%) of Mr. Grover's potential jurors believe that the term "insurrection" would describe his actions on January 6, and another 72% of such potential jurors wrongly believe Mr. Grover was "trying to overthrow the US government". (*Id*.) Importantly, the study concludes that "prospective jurors in the District of Columbia are more likely than adults nationwide, by a statistically significant margin, to believe that the January 6 defendants were trying to overturn the election and keep Donald Trump in power, were involved in an 'insurrection,' and were 'trying to overthrow the U.S. government.'" (*Id* at 4, ¶ 18.)

**B. As compared to a similar city, a D.C. jury pool is demonstrably more prejudiced against people like Mr. Grover.**

Select Litigation conducted a comparison of results with the separate district of Atlanta, basing the selection of Atlanta for purposes of the study on its close approximation to the racial composition of the District of Columbia, in addition to numerous other considerations and research into other divisions of the federal court system. (*See generally*, *Id* at 5 ¶ 20). A poll with identical

questions was conducted in the Atlanta Division over the same days as the poll in the District of Columbia; The study concludes that there is a significant and unique disparity in the negative views of the accused held by prospective D.C. jurors that does not exist in a comparable city (i.e., Atlanta). *Id* at 5-8.

Multiple sources confirm that the votership of Washington D.C. overwhelmingly supported President Biden in the election, with only approximately 5% of voters casting a ballot for President Trump in 2020.[3] As noted by Select Litigation's data, "no other federal court division had a Presidential vote as lopsided as the District of Columbia in 2020." (*Id* at 6, ¶ 22). Various reporting accounts for the sadness and anger felt personally by residents of the District of Columbia—a *personal* loss or first-hand experience associated with these cases and the resulting security measures enacted for the months following[4]. Counsel expects, based on informal polling, that prospective jurors in Washington D.C. will recall first-hand the past, where monuments and federal structures were open to enjoyment by residents, and blame the increased loss of enjoyment on these alleged criminal actors who they perceive to threaten the safety of others. Further, residents of D.C. may have personal knowledge about restrictions related to entry onto the Capitol grounds beyond the evidence presented in the case. The data indicates that the residents and eligible jurors in the District of Columbia are demonstrably prejudiced against people like Mr. Grover and will not be able to impartially follow the law.

### C. The widespread publicity is *greater* in D.C. than in other places.

It is difficult for counsel to provide a complete accounting of the media and publicity relating

---

[3] General Election Certified Results at https://www.electionresults.dcboe.org/election_results/2020-General-Election
[4] See, *Rival Jan.; 6 Vigils Reflect Deep Divides Over Insurrection* at https://www.washingtonpost.com/dc-md-va/2022/01/06/dc-vigils-january-6-capitol/; : '*It was an Attack on Our Hometown': How 11 Washingtonians Remember the Insurrection* at https://dcist.com/story/22/01/05/dc-locals-jan-6-capitol-insurrection-anniversary/.

to the Jan. 6 cases(s). According to the cited jury study, almost all prospective jurors in Washington D.C. remember being exposed to media coverage of January 6th (over 90% have seen, read, or head some.) (*Id* at page 3, ¶ 13).

Concededly, the event received national media attention and any jurisdiction in the United States will have experienced reporting on the events at the U.S. Capitol January 6, 2021. However, as evidenced by any number of public media databases reporting on these events and cataloguing the known details of individual cases, most of the people accused of Jan. 6-related crimes *are not residents of Washington, D.C.*[5] They are perceived generally as pro-Trump supporters, extremists, insurrectionists, or even white supremacists, who travelled to Washington D.C. to engage in what has been depicted as domestic terrorism. (*See Id*, at Page 3, ¶ 14).

Further, there is a disparity in the media coverage in D.C. as compared to Atlanta: stories about and mentions of the January 6 incident were more common by D.C. media outlets than by comparable outlets in Atlanta in print, broadcast, and internet. (*Id*, at 8, ¶ 27). The *Washington Post* ran roughly *twice* as many stories totally or mostly dedicated to the January 6 matter as the dominant newspaper in Atlanta. (*Id*, at 9, ¶ 280). The study notes similar disparity in web and broadcast coverage. (*See*, *Id* at 9-10).

Various news media outlets have published and keep updated specific information relating to individual defendants.[6] In the footnoted article and website, for example, National Public Radio (NPR) provides a listing of the accused with photographs of them and reference to available inculpatory evidence gleaned from case documents. This particular example cites to specific

---

[5] *Id*, noting place of arrest of each defendant.
[6] See, http://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories (last visited April 5, 2022).

statements alleged to have been made by Mr. Grover concerning his feelings about the election and his travel to Washington D.C. The statements, published in this fashion, lack the benefit of accurate context and demonstrate the specific reporting related to the accused. NPR is headquartered in Washington, D.C.[7]

The Court should also consider the duration of time between a widely reported crime and the trial. *Skilling*, 561 U.S. at 382. In this instance, the reporting has been ongoing since January 6, 2021 and continues. In the first Jan. 6 trial (*United States v. Guy Reffitt*, 21-cr-0032, DLF), the national reporting continued. If past is prologue, the media will cover Mr. Grover's trial.

The analysis conducted by the District Court transferring venue in *United States v. McVeigh* is instructive. (*See*, *United States v. McVeigh*, 918 F. Supp. 1467, 1461 (W.D. Okla. 1996)). The case received a great deal of attention in the media, and was reported on television, radio, and in print. (*See generally*, *Id*). The *McVeigh* case involved the deaths of 168 people, injuries to hundreds of other people, the complete destruction of the Alfred P. Murrah Federal Office Building, and collateral damage to other buildings including the United States Courthouse. (*Id*). The *McVeigh* court found that, "[t]he effects of the explosion on that community are so profound and pervasive that no detailed discussion of the evidence is necessary." (*Id*). However, the analysis regarding venue turned in large part on the disparity and effect of the media in Oklahoma and on its unique impact on the local community. In considering the effect of the media, the Court noted:

> Extensive publicity before trial does not, in itself, preclude fairness. In many respects media exposure presents problems not qualitatively different from that experienced in earlier times in small communities where gossip and jurors' personal acquaintances with lawyers, witnesses and even the accused were not uncommon. Properly motivated and carefully instructed jurors can and have exercised the discipline to disregard that kind of prior awareness. Trust in their ability to do so diminishes where prior exposure is such that it evokes strong emotional responses or such an identification with those directly affected by

---

[7] See, https://www.britannica.com/topic/National-Public-Radio (last visited April 5, 2022).

the conduct at issue that the jurors feel a personal stake in the outcome. That is also true when there is such identification with a community point of view that jurors feel a sense of obligation to reach a result with will find general acceptance in the relevant audience. *Id*.

While the *McVeigh* case also received national media attention, in transferring venue "the district court implicitly found that the Denver jury pool was not as intensely affected by the bombing or the subsequent publicity as was the Oklahoma jury pool." (*See*, *United States v. McVeigh*, 152 F.3d 1166 (U.S. App. 10th Cir.)).  Similarly, Denver is simply not as intensely affected by the events at the Capitol January 6, 2021 or the subsequent publicity as the jury pool in Washington, D.C.

The Washington D.C. jury pool has prejudged the accused as attempting to violently overthrow the United States government. They feel a deep connection to the attack. Many know people who were at the Capitol when the breach occurred. Reporting covering the *Reffitt* case indicates a strong narrative from prospective jurors indicating that they were viscerally affected by it, that they knew people who were "freaked out" by Jan. 6.[8] Potential jurors reportedly described connections to the government and the attack itself—many potential jurors talked about their experiences on Jan. 6 relative to the events or people they knew who worked at the Capitol or were affected by the attack.[9]

The Court may presume prejudice where the news media influence pervades the Proceedings and ignites extensive prejudice in the community. (*See, Id*). As the Court of Appeals found in *McVeigh*, "in such cases, we simply cannot rely on 'jurors' claims that they can be impartial'". (*Id*, *(citing Mu'Min*, 500 U.S. at 429)).

## II.    In the interest of justice, Mr. Grover respectfully requests a transfer to his home district of Colorado.

---

[8] See, Jury Selection in first Jan. 6 Trial Revives D.C. Residents' Anger About Capitol Attack at https://www.nbcnews.com/politics/justice-department/jury-selection-first-jan-6-trial-revives-dc-residents-anger-capitol-at-rcna17954.
[9] *Id*.

Counsel recognizes that a defendant does not have the right to be tried in his home jurisdiction. However, independent of the transfer of venue based upon grounds of a presumption of prejudice, Rule 21(b) of the Federal Rules of Criminal Procedure also permits the Court to transfer a case in its discretion for the convenience of the parties. Rule 21(b) states:

> **For convenience**. Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice.

Mr. Grover works and resides in Colorado. His family and support network reside in Colorado. His lead counsel resides in Colorado. While he has the benefit of experienced local counsel on this matter pursuant to the Court's local rules, he does not have the resources to employ a separate Washington D.C. firm to co-chair the case at trial. He must furnish resources for he and his counsel to travel to Washington D.C. for trial—a trial which he expects will receive national media attention and where he has no ties to the community. While the Defense wishes to maintain the same prosecuting attorneys and judicial officer, a trial in his home jurisdiction will afford Mr. Grover a more diverse jury pool of his peers in a similarly urban environment, a significant conservation of travel expenses that can be used toward his defense of this very serious matter, and proximity to his family and support system for what may be a nationally publicized trial.

## CONCLUSION

Ultimately, the politically charged nature of this case and its deep and lasting impact on the community of Washington D.C. cannot be understated. While the jury pool in any jurisdiction will include individuals who subscribe to different politics and beliefs than what has been reported about

Mr. Grover's, and who have been exposed to some media about the case, the likelihood of seating impartial and unbiased jurors in Washington D.C. appears remote at best.

While a transfer of venue may not diminish the national impact of the media, the removal of the proceedings from Washington D.C. will substantially diminish the prejudice unique to this jury pool as it concerns the proximity of the events which had a direct impact on the community and residents of Washington, D.C. and where disparate exposure to the media has occurred. Finally, Mr. Grover specifically requests a transfer to the District of Colorado given that it is where he lives and is a comparable metropolitan jurisdiction. Transfer of venue in this regard would afford Mr. Grover significant financial relief and access to his support system who would like to attend his trial.

WHEREFORE, based upon the authority and grounds stated herein, Mr. Grover respectfully requests a transfer of venue to his home district of Colorado for trial.

Respectfully submitted this 6th day of April, 2022.

s/ Megan M. Downing
Megan M. Downing
RECHT KORNFELD, P.C.
1600 Stout Street, Suite 1400
Denver, CO 80202
Phone: 303-573-1900
Fax: 303-446-9400
megan@rklawpc.com

s/Kobie Flowers
Kobie Flowers
BROWN GOLDSTEIN & LEVY
1717 K Street, NW, Suite 900
Washington, D.C. 20006
Phone: 202-742-5969
kflowers@browngold.com

## CERTIFICATE OF SERVICE

  I hereby certify that on this 6th day of April, 2022, I electronically filed the foregoing **Motion to Transfer Venue for Trial** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.


*s/ Erin Holweger*
paralegal