**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00374 (APM)** |
| **v.** | : | |
| | : | |
| **LOGAN GROVER, also known as** | : | |
| **(Logan V R Grover),** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Logan Grover ("Grover") to 45 days' incarceration, 3 years' probation, 60 hours of community service, and $500 in restitution.

### I.    Introduction

Defendant Grover is a 44-year-old former United States Army officer, owner of a real estate holding and development company, and a law school graduate. After attending the "Stop the Steal" rally on January 6, 2021, then returning to his hotel room where he saw television coverage of the assault on the Capitol Building, he went to the Capitol to join other rioters in the assault. He participated in the violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on July 20, 2022, (ECF No. 60 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ $2,881,360.20. That

Grover pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 45 days' incarceration is appropriate in this case because Grover: (1) posted on social media—after arriving in Washington, D.C. on January 5, 2021 for the "stop the steal" rally scheduled for the next day—that he "recognize[d] that violence is highly likely[,]" on January 6 but that he was "certain" he needed to be there; (2) took numerous photographs at the Capitol with posted "Area Closed" signs in the background on January 5, 2021, which alerted him to the secured nature of the Capitol perimeter and disregarded those warnings on January 6 when he breached the secured perimeter; (3) was aware of the potential for violence because he responded to the Capitol only after hearing it had been breached; (4)  climbed over fencing affixed with area closed signs; (5) saw and photographed rioters climbing on scaffolding before entering the Capitol; (6) entered the Capitol through the East Rotunda Door as police officers were attempting to prevent rioters from entering, (7) briefly scuffled with a police officer inside the Rotunda while that officer was attempting to clear the rioters from that area; (8) remained on Capitol Grounds long after police officers expelled him from the Rotunda; and (9) sought to deny his guilt for participating in the riot—even after admitting his guilt under oath—during a post-plea interview with the FBI.

The Court must also consider that Grover's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Grover's crime support a sentence of 45 days' incarceration in this case.

---

amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

The Court must also consider that Grover's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, Grover's participation in a riot that succeeded in halting the Congressional certification combined with Grover's knowing disregard for "Area Closed" signs prior to the riot, his return to the Capitol to specifically and unlawfully enter the Capitol, and his lack of remorse, demonstrate that a sentence more significant than probation is warranted here. A sentence of incarceration is both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 60 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent contributed, directly and indirectly, to the violence and destruction of that day.

### Defendant Grover's Role in the January 6, 2021 Attack on the Capitol

Logan Grover, lives in Erie, Colorado. ECF 63 ¶ 18. On January 4, 2021, Grover traveled from Denver, Colorado to Washington, D.C., by commercial airplane. *Id.* The purpose of Grover's trip to Washington, D.C. was to attend the former President's "Stop the Steal" rally, which was a protest of Congress' certification of the Electoral College vote. *Id.* Among the items Grover packed for the trip were a mouthpiece, body armor, tactical gloves, noise suppression ear plugs, a broken

scissor, an emergency poncho, a N95 respirator/dust mask, and two hairbrushes with pointed ends.[2] *See* Figure 1.



*Figure 1 – Law enforcement recovered the above photograph from Grover's cellular phone. Unless stated otherwise, all photographs included in this memorandum were likewise recovered from Grover's cellular phone.*

On January 5, Grover posted to Facebook a message that stated:

If you accept the reality that the election was stolen, than [sic] You can't accept Biden as the new president - & neither can I… which is why I flew to DC yesterday. I fought for this nation. Brothers & Sisters Lost limbs & life for this nation. I won't sit idle while the nation is stolen in some insane, slow motion, treasonous insurrection. I'm not sure what to do at a rally & protest, it's my first of both… DC Democrats have activated National Guard elements to reinforce local police against trump supporters, who have done nothing - strange that DC didn't do that during the months of rioting, looting, arson & murder… I can't see another video of

---

[2] This information is derived from Grover's post-plea interview with the FBI, which is detailed in a separate section of this memorandum.

families & children being attacked & terrorized by Antifa & BLM thugs, knowing that I could do something to prevent it.  I have no interest in violence. Sadly, I recognize that violence is highly likely. I'm not certain what's going to happen tomorrow. I am certain I need to be here.

ECF 1-1 at 2 (anonymous tip provided to the FBI); ECF 63 ¶ 19; *see also* Figure 2.



*Figure 2 – Facebook Post.*

Grover also walked around Washington, D.C. on January 5, 2021. ECF 63 ¶ 20. Grover

wore a red-colored hat emblazoned with the word "MAGA" in white lettering and "T2" on the

back of the hat; a dark-colored jacket with white lettering; a white, green, and black striped shirt; and blue jeans.

Grover took many photographs. ECF 63 ¶ 20. Among these photographs were photographs in which Grover posed with the Capitol in the background that captured fencing around portions of the Capitol grounds affixed with signs that read, "Area Closed by order of the United States Capitol Police Board."[3] *Id.* ¶ 20; *see also* Figures 3-4 below:



*Figure 3 – Photograph of Grove and an Area Closed sign recovered from Grover's cellular phone.*

---

[3] Grover's photograph, Figure 3, of himself with the Area Closed sign in the background is a "selfie" photograph taken using a front-facing camera. It created a mirror image (text appearing backwards).



*Figure 4 – an example of an Area Closed sign.*

On January 6, 2021, Grover attended the "Stop the Steal" rally. *Id.* ¶ 21. Grover wore the same "MAGA" hat and jacket he wore on January 5. A tan-colored balaclava covered his head and he wore a green-colored checkered shirt, and blue jeans. After the rally concluded, Grover returned to the hotel. *Id.*

Meanwhile, the Congressional proceeding to certify the 2020 Electoral College vote for President continued in both the House and the Senate, with Vice President Pence present and presiding over the Senate. While those proceedings took place, a large and unruly crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. *Id.* At approximately 2:00 p.m. members of the crowd forced their way through, up, and over barricades used to secure the Capitol perimeter. *Id.* at ¶ 5.

Back at the hotel, Grover ate lunch and watched television and  saw news reports of people at the Capitol. He then left his hotel room and made his way towards the Capitol. *See also*, ECF 63 ¶ 21.  Grover arrived on restricted grounds by approximately 2:46 p.m. *Id.*  ¶ 21; *see also* Figure 5.



*Figure 5 – Grover, circled in red to the far left of this photograph, stepping over the restricted perimeter fencing. Grover's identification and location was established through comparing CCV footage and cell phone data. The "AREA CLOSED" signs in the screen capture are also depicted within red circles.*

Grover walked to the northwest side of the Capitol and observed portions of the crowd that had seized control of the West Plaza, the scaffolding erected as part of the inauguration stage, and the exterior stairs leading to the Capitol building's Lower and Upper West Terraces. ECF 63 ¶ 22. Grover took photographs of the crowd and, in some instances, posed to capture himself with the crowd in the background. *Id.* Grover also posed for photographs of himself with police officers in the background.  *See* Figures 6-7, below.



*Figure 6 – Grover "selfie" Photograph on restricted Capitol Grounds with others in the background.*



*Figure 7 – Photograph of Grover on restricted ground with Capitol police officers in the background.*

Grover then walked to the east side of the Capitol, arriving by approximately 3:03 p.m. ECF 63 ¶ 23. He walked past the northern stairs on the east side of the building which lead to the Senate chamber. *Id.* Then, he walked to and climbed stairs which lead to a landing outside the Capitol Rotunda. *Id.*

At approximately 3:15 p.m., Grover entered the Capitol through the East Rotunda Door. *Id.* ¶ 24. At the time of his entry, the windowpanes in those doors were shattered and an alarm was sounding continuously. *Id.* As Grover entered the Capitol, police officers were standing at the Rotunda door, pushing against the crowd to eject rioters who were inside the building and prevent others from entering. *Id.* United States Capitol Police ("USCP") close circuit video ("CCV")

footage established that once inside the crowded East Rotunda Door vestibule area, Grover glanced back at the officers attempting to preventing other rioters this from entering the Capitol, turned, and then walked into the Rotunda. S*ee* Figures 8.1- 8.3. Meanwhile, other individuals seeking to leave the Capitol began to exit through the Rotunda Door. *See* Figure 8.4.



*Figure 8 – USCP officers attempting to prevent additional rioters from entering the Rotunda vestibule area.*



*Figure 8.1 – Grover entering the Rotunda vestibule.*



*Figure 8.2 – Grover looking back as officers attempt to prevent additional rioters from entering the Rotunda vestibule.*



*Figure 8.3 – Grover looking back towards the East Rotunda Door entrance from a different CCV camera angle as in Figure 8.2 before entering the Rotunda.*



*Figure 8.4 – USCP officers allowing individuals to exit the Rotunda Door.*

Grover entered the Rotunda as USCP Officers and Metropolitan Police ("MPD") Officers

encircled rioters, confined them to a small area, and expelled them from the Rotunda. ECF 63 ¶

25. As the officers cleared the Rotunda, some rioters scuffled with the officers. A police officer directed Grover towards the Rotunda exit. Grover then moved to the left and behind an MPD officer closer to the exit. A MPD officer alerted the MPD officer in front of Grover of Grover's presence. When that MPD officer turned around, Grover squeezed between the wall, a statue, and the MPD officer, which resulted in contact and brief scuffling with the officer and the loss of Grover's hat. *See* Figures 9 – 9.3.



*Figure 9 – Grover inside the Rotunda.*



*Figure 9.1 – Grover behind a MPD officer.*



*Figure 9.2 – Grover scuffling with a MPD officer.*



*Figure 9.3 – continued scuffling with the MPD officer and where Grover's hat was dislodged.*

At 3:21 p.m., Grover exited the Rotunda. ECF 63 ¶ 25. While waiting in the vestibule area to exit the East Rotunda Door, Grover took photographs of other rioters and himself. Grover also asked officers to help him find his hat. Grover exited the Capitol at 3:32 p.m. ECF 63 ¶ 25. Thereafter, Officers closed the East Rotunda Door. Grover stayed outside the East Rotunda Door and on the Capitol grounds until approximately 5:06 p.m. ECF 63 ¶ 25.

*Social Media Posts*

During and after the riot, Grover engaged with many of his friends using Facebook Messenger regarding the Capitol breach and his role in it. On January 6, 2021, at 4:14 p.m.,[4] R.H., a friend of Grover, sent him a Facebook Messenger post that read: "You've affiliated yourself with an odd group of folks in DC trying to destroy everything we swore our lives to defend: our country, the Constitution, and the institutions thus created that our system of government." In a later

---

[4] These times are converted from Coordinated Universal Time (UTC) time stamps that appear in the messages to Eastern Standard Time in effect on January 6 in Washington, D.C.

message to Grover, R.H. stated he hoped that Grover was safe. At 4:46 p.m., in response to both messages, Grover wrote: "We swore to defend a lawful system of gov't.  When it ceases to abide by those laws, it becomes unlawful. Having said that, I don't support revolution - yet. Staying safeish [sic], thanks."  At 4:49 p.m., R.H. sent Grover a message stating: "Notwithstanding his inciting of the mob to violence, I'm glad you're safe[,]" and seconds later, "[President Trump] has since backtracked and called for everyone to go home." In response, Grover wrote: "No election fraud?"

Although many of Grover's friends and supporters of his actions on January 6 praised his actions, some did not. For example, one individual, B.P., posted, "The actions displayed today in our nation's capital [sic] are reprehensible and disgusting." Grover responded, "I would say counterproductive & tragic."  When asked by N.F., "Hi Logan Grover. Did you achieve what you wanted today?" Grover responded, "I did, but not as part of the riot." Another individual, A.P., posted:

> Logan, as an attorney, how can you possibly buy into this propaganda? No court has found any evidence of election fraud. We are a profession of facts, of rules, of evidence and logic. And what is being done goes against everything that as a military officer and an attorney we should stand for.

Perpetuating false claims of election misinformation, Grover responded:

> I understand & agree with what you're saying [A.P.]. We just don't see the situation in the same way. Nothing would make me more happy than to be wrong about all of the corruption & fraud that I see - just another election, we'll get them next time… sadly, that's just not true.

*Grover's FBI Interview*

Pursuant to the terms of the plea agreement, FBI agents interviewed Grover for over 40 minutes on November 15, 2022. The agents also reviewed with Grover a social media post (Figure 2), phone location data, and photographs recovered from Grover's phone, including Figures 1 and

3.  Grover told the agents he arrived in Washington, D.C. on January 5, 2021. He stayed at a hotel close to the Capitol, although he could not remember the name of the hotel. He traveled alone and did not know anyone else who was attending the rally.  Grover went to Washington, D.C. to support efforts to find answers to questions about the 2020 election. He booked his flight and hotel reservations in late December 2020.

Regarding the body armor, gloves, mouthpiece, ear plugs, and other items in Figure 1, Grover admitted taking a picture of the items laid out on the bed. He stated that he brought the items from Colorado to Washington, D.C. but did not take them to the rally on January 6 because he was not concerned about attacks from protesters at the rally. He thought members of Antifa or Black Lives Matter might attack after dark. Regarding Figure 3, the photograph of Grover posed with an "Area Closed" sign in the background, Grover told the agents that he took the photograph specifically because of the area closed sign in the background and understood that the sign meant he could not go past the sign, which he did not do on January 5. Grover asserted, however, that on January 6, the signs, fencing, and barricades were no longer there. This assertion is contradicted by CCV footage of Grover entering restricted Capitol grounds by stepping over fencing with apparent signage along the fencing. *See* Figure 4.

On January 6, Grover ate breakfast and then walked to the Capitol. It was cold. The rally started about two hours late and he stayed because the former President was the major event speaker. After the rally ended, Grover walked back to his hotel where he ate lunch. He also watched television and then saw people at the Capitol, so he decided to leave the hotel and make his way there. Grover could not recall whether he took the tactical vest or other items shown in Figure 1 with him when he left the hotel room and made his way to the Capitol.

Grover asserted he went to the Capitol to see what was going on at the Capitol. He described the scene at the Capitol as "a surreal scene," with people everywhere, on the Capitol Grounds lawn and the stairs. According to Grover, all the staircases were overcrowded and therefore he went to the central entrance where he saw police officers standing on the staircase as people streamed in and out of the Capitol, which was the first time he saw people entering the Capitol. When the lead FBI agent asked Grover why he went inside the Capitol, Grover responded:

> I didn't intentionally go in, to be honest with you. I was just standing inside the doorway and there was a man yelling at people to go inside which was very odd. And then someone came out and said that a woman had been shot. I have experience with injuries and treating injuries, combat related injuries. And so I stepped forward to see if I could… reach her and help her in some way. At that time, the people around the entrance massed and surged forward. I found myself in the middle of this group of people and I was being pushed from behind. I couldn't even do more than just turn my head to say no to the guy pushing me in the back because the people were so tight and if I didn't move with the crowd I was going to get knocked over and trampled. So the best I could do was brace up and move with the crowd and that's how I went inside.

Grover later stated during the interview that once he was pushed inside, he knew it was not a place he wanted to be and further that was "why as soon as I was able I turned around and started making my way out."

Grover's assertion that he did not intentionally enter the Capitol is belied by the statement of offense in support of his plea agreement, which he signed, and in which he admitted that "he willfully and knowingly entered the U.S. Capitol Building, knowing that he did not have permission to do so." This claim, and his claim that he attempted to leave as soon as he was inside the Capitol, are not support by the CCV footage either.  After entering the East Rotunda Door and into the Rotunda vestibule area Grover went directly into the path of individuals expelled from the Rotunda by police officers. *See* Figure 8.3. He did not stop and wait in the vestibule area for police officers to let him go outside.

Regarding the length of time Grover stayed outside the East Rotunda Door after he was expelled from the Capitol, Grover said that an officer inside the Capitol was looking for his hat and that he was not trying to go back inside the Capitol. After Grover accepted that he would not get his hat back, Grover wanted to leave but was unable to return to his hotel because the streets were closed. Therefore, he hung around the Capitol to see what was going on.

Grover described the rally goers as peaceful and celebratory. He also stated that trespassers on Capitol grounds were the same and differentiated them from rioters inside the Capitol who he described as angry and in pain.  He blamed the rioting on a small number of Antifa, Black Lives Matters, Proud Boys, and Oath Keeper agitators. He further told the agents that the Capitol riots were tragic and counterproductive.

*The Charges and Plea Agreement*

On April 26, 2021, the United States charged Grover by criminal complaint with violating 18 U.S.C. § 1752(a)(1) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building, 40 U.S.C. § 5104(e)(2)(D) - Violent Entry and Disorderly Conduct on Capitol Grounds, 40 U.S.C. § 5104(e)(2)(G) - Parading, Demonstrating, or Picketing in a Capitol Building. ECF 1. On April 28, 2021, law enforcement officers arrested Grover near his home in Erie, Colorado.

On May 6, 2021, the United States charged Grover by a four-count Information with violating: (Count One) 18 U.S.C. § 1752(a)(1) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; (Count Two) 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building; (Count Three) 40 U.S.C.

§ 5104(e)(2)(D) - Violent Entry and Disorderly Conduct on Capitol Grounds; and (Count 4) 40 U.S.C. § 5104(e)(2)(G) - Parading, Demonstrating, or Picketing in a Capitol Building. ECF 7.

On July 20, 2022, pursuant to a plea agreement, Grover pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G) - Parading, Demonstrating, or Picketing in a Capitol Building. ECF 59. By plea agreement, Defendant agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Grover now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Grover faces up to six months of imprisonment and a fine of up to $5,000. Grover must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days' incarceration, 3 years' probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy."
*United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds
of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while
staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States
v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Grover's
participation in that attack to fashion a just sentence, this Court should consider various
aggravating and mitigating factors. Notably, for a misdemeanor defendant like Grover, the absence
of violent or destructive acts is not a mitigating factor. Had Grover engaged in such conduct, he or
she would have faced additional criminal charges.

One of the most important factors in Grover's case is his return to the Capitol. Grover did
so after the rally at the Ellipse was over and he had returned to his hotel room. Grover stated he
learned of rioters at the Capitol after he watched television. Grover would have seen reports of
violence and trespassing onto restricted areas before he walked out of his hotel room. The fact that
he did so after watching television and becoming aware of the rioting, an event unlike anything in
the Nation's history,  highlights his specific intent to violate the law by entering the Capitol despite
knowledge that he was entering restricted grounds and that rioters were scaling scaffolding and
forcing their way into the Capitol.

Further, Grover's self-serving—and demonstrably untrue—statements made during his
post-plea interview that the area closed signs, fencing, and barricades were missing when he
returned to the Capitol on January 6 is incredible. Moreover, his claim that he attempted to exit
the Capitol as soon as he was able once pushed inside is flatly contradicted by the CCV footage.
Additionally, Grover's Facebook messenger posts and post-plea interview display an utter lack of

remorse to such an extent that had this been a guideline case, denial for acceptance of responsibility would have been appropriate.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Grover

As set forth in the PSR, Logan Grover does not have a criminal history. ECF 63 ¶ 31.  He has a bachelor's, MBA, and law degrees, and served in the United States Army from December 2001 until January, 2006.

While Grover's prior military service and educational attainment, including graduating law school is laudable, it renders his conduct on January 6 all the more troubling. His voluntary decision to return to the Capitol area after the rally and then storm a guarded government building is nothing short of shocking in light of his former military service and training, and education in the law. In this case, Grover's conduct and former military service demonstrates a very real need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to

convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

A term of incarceration will serve the important purpose of specific deterrence. Grover was not deterred from entering the Capitol after watching scenes of chaos on television. To the contrary, he was enticed by them. Notwithstanding his military service and legal training, both of which should have impressed on Grover the importance of acting lawfully and being truthful when speaking with law enforcement officials, Grover knowingly violated the law by entering the Capitol and then was less than truthful when interviewed by the FBI. Rather than recognizing the unlawfulness of his conduct on January 6, he told an acquaintance that his conduct was an appropriate act of Patriotism and protest. Because Grover proved unable to marshal his considerable advantages to prevent him from violating the law on January 6 and then misrepresenting his conduct when he spoke to FBI agents, a term of incarceration is necessary to drive home to him that his conduct cannot be repeated.

Moreover, the acceptance of responsibility, or failure to do so, is significant to assessing the demands of specific deterrence in any particular case. After pleading guilty, Grover told the FBI that he did not enter the Capitol intentionally and did not know he was not allowed to be there. These claims flatly contradict Grover's solemn statements in court, under oath, when he pleaded guilty. Grover's statements during his FBI interview evince a lack of remorse and a willingness to participate in similar conduct in the future. Here, a sentence of incarceration is necessary to promote the goal of specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Grover based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Grover has pleaded guilty to Count 4 of the Superseding Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants

---

[5]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

27

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been

accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Although Grover was permitted to plead guilty to a petty offense, his physical altercation with the MPD officer in the Rotunda harkens to some cases in which the defendants pleaded guilty to obstruction of a police officer during a civil disorder, in violation of 18 U.S.C. § 231(a)(3). For instance, in *United States v. Daryl Johnson*, 21-cr-407 (DLF), the defendant and his son climbed through a smashed-out window near the Senate Wing Door to unlawfully enter the Capitol building, and remained inside for approximately 26 minutes. Approaching the Rotunda doors, the Johnsons encountered and joined a group of rioters who pushed against a line of police officers who were trying to prevent other rioters from entering the building.  Later, Daryl Johnson made inflammatory statements on social media. He pleaded guilty to violating 18 U.S.C. § 231(a)(3) and Judge Friedrich sentenced him to 30 days' incarceration.

Somewhat more egregious was the conduct in *United States v. Andrew Griswold*, 21-cr-459. There, the defendant, the owner of a Florida construction business, pushed his way into the Capitol Building past police trying to guard the Rotunda Doors, then moved through the building all the way to the Senate Chamber, where he yelled, "this is our house now!"  After leaving the building, he gave an interview on the Capitol steps where he gloated that Members of Congress "ran and hid" while "we took the building."  He also pleaded guilty to violating § 231(a)(3), and Judge Cooper sentenced him to 75 days' incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.  This Court's Authority to Impose a Sentence of Up to 14 Days of Imprisonment and Probation.

As nine judges of this District have now concluded, this Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022)

(concluding that " a split sentence is permissible under law and warranted by the circumstances of this case), *appeal pending*, D.C. Circuit No. 22-3018; *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21cr630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21cr686 (FYP), ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21cr342 (PLF), ECF 74 (D.D.C. August 1, 2022) (same); *United States v. Ferreira*, 22cr210 (TSC) (D.D.C. October 6, 2022).[6] This Court should follow suit and sentence Grover to 45 days' incarceration and 3 years' probation.

But this Court need not decide that question in this case because there is no dispute that such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways.

---

[6] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).  A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10).  S*ee United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21cr278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21cr278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21cr125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21cr627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21cr620 (BAH) ECF D.D.C. Apr. 29, 2022) (43 (same); *United States v. Heinl*, 21cr370 (EGS) ECF 43 (D.D.C. June 8, 2022) ECF 43 (same); *United States v. Cameron*, 22-cr17 (TFH) ECF 36 (D.D.C. Aug. 17, 2022) (same); *United States v. Jeremiah Carollo*, 22cr44 (APM) (D.D.C. Sept. 13, 2022).

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 45 days' incarceration, 3 years' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior and failure to accept responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ *Michael G. James*
MICHAEL G. JAMES
Assistant United States Attorney
N.Y. Reg. No. 2481414
Office of the United States Attorney
Eastern District of North Carolina
(on detail to the USAO-DC)
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Mike.James@usdoj.gov
Telephone: (919) 856-4530

## CERTIFICATE OF SERVICE

On this 22nd day of November 2022, a copy of the foregoing was served upon all parties

listed on the Electronic Case Filing (ECF) System.

By:    */s/ Michael G. James*
MICHAEL G. JAMES
Assistant United States Attorney
N.Y. Reg. No. 2481414
Office of the United States Attorney
Eastern District of North Carolina
(on detail to the USAO-DC)
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Mike.James@usdoj.gov
Telephone: (919) 856-4530